UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE INCLUSIVE COMMUNITIES PROJECT, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:14-CV-3333-B |
| THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | § § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

The Inclusive Communities Project, Inc. (ICP), a "Dallas[-]based fair housing organization which works to create and maintain racially and economically inclusive communities," submitted a Freedom of Information Act (FOIA) request to the United States Department of Housing and Urban Development (HUD) for records containing information on House Choice Vouchers (HCV) used in Dallas-area counties as of June 30, 2013. Doc. 18, Pl.'s First Am. Compl. ¶¶ 6, 9. Under the Freedom of Information Act (FOIA), "an agency must disclose all records requested by 'any person' unless the information sought falls within a specific statutory exemption." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1226 (D.C. Cir. 2008) (internal citations and quotations omitted). In response to ICP's request, HUD, invoked FOIA Exemption 6, which protects individual privacy interests in government records, to withhold some of the requested information. *See* Doc. 35, Pl.'s App. 9–12, HUD's FOIA Resp. The only issue before the Court, raised via the parties' cross-motions for summary judgment, is whether HUD's withholding of this information was lawful. Doc. 33, Pl.'s

Mot. Summ. J.; Doc. 41, Def.'s Mot. Summ. J. For the following reasons, ICP's Motion (Doc. 33) is **GRANTED in part** and **DENIED in part**, and HUD's Motion (Doc. 41) is **DENIED**.

## I.

### BACKGROUND

HUD is the agency responsible for administering the Section 8 Housing Choice Voucher Program (HCV Program), under which low-income families receive HCVs to subsidize their housing. *See* 42 U.S.C. § 1437f(a), (o); 24 C.F.R. § 982.1. HUD administers this program, in part, by maintaining non-public records of program participants' personal details received via Form HUD-50058 (a form families participating in the HCV Program must submit to HUD). *See* Doc. 43, Def.'s App. 20–45, Form HUD-50058. If HUD releases non-public records such as information from HUD-50058, it redacts the records according to a protocol it calls the Rule of 11: "information is only made available on the characteristics of a group if there are at least 11 members of the group." Doc. 49, Pl.'s Resp. App. 6–7, Negot. Emails.

On January 22, 2014, ICP submitted a two-part FOIA request to HUD seeking release of records containing information for each "Housing Choice Voucher located in the Dallas, Texas area counties . . . included in the HUD Resident Characteristics Report as of June 30, 2013." Doc. 35, Pl.'s App. 3, FOIA Request. As part of their request, ICP agreed to HUD's use of a Rule of 11 redaction scheme that the parties had used in a previous case:

> ICP agrees to the use of a digit tract code (XX replaces the last 2 digits) for records from census tracts[1] containing 10 or fewer HCV holders. If there are still HCV

---

[1] "Census tracts are small, relatively permanent statistical subdivisions of a county . . . that are updated . . . prior to each decennial census." *Geographic Terms and Concepts - Census Tract*, United States Census Bureau (Aug. 31, 2016), https://www.census.gov/geo/reference/gtc/gtc_ct.html. For more information

holders that could not be aggregated at the 4 digit census tract code for census tracts containing 10 or fewer HCV holders, ICP agrees to the provision of the records with state/county code but no tract information and with the unit Owner Name suppressed (XXXXXX replaces the tract code).

*Id.* at 7, FOIA Request. Importantly, this agreed-to version of the Rule of 11 is less restrictive than the version HUD currently applies.[2] Specifically, this version requires redaction only when a census tract or aggregated set of census tracts contain fewer than eleven HCV holders.[3] By contrast, HUD's current version requires redaction when any geographic grouping contains fewer than eleven HCV holders. The Court will refer to the first version as the Census Tract Rule of 11 and the second version as the Geographic Unit Rule of 11.

On January 31, 2014, HUD acknowledged it had received ICP's two-part FOIA request, and stated that it would process the request within thirty to forty-five days. Doc. 18, Pl.'s First Am. Compl. ¶ 1. In September, after receiving no response from HUD, ICP filed suit in this Court under 5 U.S.C. § 552(a)(4)(B). *Id.* ¶ 5. Three months later, HUD released some, but not all, of the information that ICP had requested. *Id.* ¶¶ 1–2.

A.      *ICP's FOIA Request: Part I*

In Part I of its FOIA request, ICP sought "household level data" related to HCVs "provided

_____

on census tracts and for an explanation of census tract codes, *see id.*

[2] HUD argues that these two data suppression methodologies are consistent. *See* Doc. 52, Def.'s Reply 2–3 ("Although ICP did not expressly define a data suppression methodology that took into account . . . smaller geographic areas, the parties agree that a population of ten or fewer recipients in a particular geographic area is problematic in terms of privacy."). The record, however, reflects that these methodologies are inconsistent, and that ICP does not agree that a population of ten or fewer recipients in a particular geographic area is problematic in terms of privacy. *See* Doc. 49, Pl.'s Resp. App. 8, ICP Email.

[3] The Court will interchangeably refer to HCV holders as housing voucher recipients or voucher recipients.

to HUD on HUD-50058 and included in HUD's Resident Characteristics Report." Doc. 35, Pl.'s App. 9, HUD's FOIA Resp. Household level data includes owner name, structure type, family type, race and ethnicity for head of household, date of birth, family income, gross rent, city, state, zip code, and census tract. *See id.* at 4, FOIA Request.

On December 15, 2014, HUD released some, but not all, of the information requested in Part I, withholding certain Personally Identifiable Information (PII) under FOIA Exemption 6. *See id.* at 9–10, HUD's FOIA Resp. According to HUD, PII means "information which can be used to distinguish or trace an individual's identity, such as their name, social security number, biometric records, etc. alone, or when combined with other personal or identifying information which is linked or linkable to a specific individual." *Id.* at 15, Notice PIH-2015-06 (based on definition from OMB M-07-16). To protect the PII of families receiving HCVs, HUD took the following steps:

(1)     Variables were rounded or categorized;

    (a)     Income was categorized as <$5,000, $5,000–10,000, $10,000–20,000, or >$20,000;

    (b)     Total tenant payment (TTP) was rounded to $250;

    (c)     Gross rent was rounded to $250;

    (d)     Housing assistance payment (HAP) was rounded to $250;

    (e)     Structure types were categorized as standalone or multi-family;

    (f)     Race of head of family was categorized as white, black, or other;

    (g)     Ethnicity of head of family was categorized as Hispanic or not Hispanic; and

    (h)     Family type was categorized as regular with children, elderly or disabled with children, regular without children, or elderly or disabled without children;

(2)    Variables were eliminated in three rounds to preserve as much usable information as possible;

       (a)    Round 1 records included state, county, or four-digit census tract code information with the variables listed above (67.6% of records);

       (b)    Round 2 records included state or county information with income, race, and ethnicity (23.17% of records); and

       (c)    Round 3 records included only state or county information (.03% of records).

(3)    Owner name was removed from all records; and

(4)    Geographic detail was reduced to four digit tract codes (or no tract codes where uniqueness could not be preserved).

*Id.* at 9–10, HUD's FOIA Resp.; Doc. 45, Pl.'s Reply 12. HUD reduced geographic detail according to the Geographic Unit Rule of 11, not the Census Tract Rule of 11. *See* Doc. 43, Def.'s App. 9–11, Decl. of Deena S. Jih ¶ 21–24 [hereinafter Jih Decl.]. In particular, it provided all geographic information for households residing in a "Census Tract/ZIP code/Public Housing Authority (PHA) combination with more than ten households," and, when "there were ten or less households in a . . . combination," it suppressed census tract information two digits at a time "until there were more than ten cases in the geographic area." *Id.* at 9, Jih Decl. ¶ 21.

B.    *ICP's FOIA Request: Part II*

In Part II of its FOIA request, ICP sought "household data" by census tract as reported in HUD's Picture of Subsidized Households. Doc. 34, Pl.'s Br. in Supp. of Mot. for Summ. J. 16 [hereinafter Pl.'s Br.]; *see also* Doc. 35, Pl.'s App. 6, FOIA Request. Household data—as opposed to household level data—includes PHA, census tract, family number per tract, poverty rate per tract, percentage of minorities per tract, new family number per tract, and poverty rate of new families. Doc. 35, Pl.'s App. 6–7, FOIA Request.

HUD again released some of the requested information, but withheld what it believed to be PII. *Id.* at 11, HUD's FOIA Resp. This time, to eliminate unique identifiers and protect personal privacy interests, HUD "zeroed out" all count and percentage variables for census tracts with ten or fewer families receiving HCV assistance. *Id.*

C.      *Negotiations*[4]

ICP disagreed with HUD's withholding and suppressing this data, and refused to dismiss its case. *See* Doc. 43, Def.'s App. 7, Jih Decl. ¶ 14. Since then, the parties have "engaged in numerous unsuccessful efforts to negotiate a settlement." *Id.* As part of the negotiations, HUD offered to: (1) consider ICP for a Data License Agreement under which HUD would release all requested data; or (2) provide ICP with an analysis of the requested data rather than releasing PII. *Id.* at 54–58, Negot. Emails. ICP declined the first offer because of restrictions on the use of analysis from the data. *See id.* at 54. It disagrees that HUD made the second offer. Doc. 48, Pl.'s Resp. Br. in Opp'n to HUD's Mot. Summ. J. 14 [hereinafter Pl.'s Resp. Br.].

On August 5, 2015, ICP gave HUD a potential modified scope of its original FOIA request, which eliminated several previously requested data fields, and offered to consider a settlement based on this narrowed list of fields. *See* Doc. 43, Def.'s App. 60–63, Narrowed List; *see also* Doc. 49, Pl.'s Resp. App. 6 ("ICP's settlement proposal did not amend its FOIA request in any way."). HUD made a counter offer in which it explained that "[t]he narrowed scope [was] helpful in eliminating a significant portion of the privacy concerns," and agreed "to release the data pursuant to the narrowed scope with only data masking pursuant to the [R]ule of 1[1] as referenced in the original FOIA

---

[4] ICP argues that evidence of the negotiations between the parties is inadmissible under Federal Rules of Evidence 408(a) and 801(c). Doc. 45, Pl.'s Reply 10. The Court will not address these arguments as they do not alter the outcome of this Order.

request." Doc. 43, Def.'s App. 64, HUD Email. But ICP rejected this counteroffer because it did not view HUD's release as complying with its modified request. *See* Doc. 49, Pl.'s Resp. App. 8, ICP Email ("[I]t still looks like HUD is suppressing non-identifying information including PHA, Zip Code, and census tracts for households in census tracts with 11 or more voucher participants.").

D.     *Motions for Summary Judgment*

Because the parties were unable to reach an agreement, they filed cross-motions for summary judgment. Doc. 33, Pl.'s Mot.; Doc. 41, Def.'s Mot.

ICP seeks the following relief: (1) an order requiring HUD to produce the agency records that it withheld and enjoining it from withholding them; (2) an order referring the matter to the Merit Systems Protection Board for investigation; (3) an order prohibiting HUD from relying on Exemption 6 to deny future FOIA requests for the same records ordered produced in this case; and (4) attorneys' fees and costs. Doc. 18, Pl.'s First Am. Compl. ¶ 42; *see also* Doc. 33, Pl.'s Mot. 2 ("ICP is entitled to judgment based on uncontested facts and the law."). HUD has responded and ICP has replied. Doc. 38, Def.'s Resp.; Doc. 39, Def.'s Br. in Supp. of Resp. [hereinafter Def.'s Resp. Br.]; Doc. 45, Pl.'s Reply. Thus, ICP's Motion is ready for review.

HUD moves the Court to "dismiss ICP's claims with prejudice, tax costs against ICP, [and] enter judgment for HUD." Doc. 42, Def.'s Br. in Supp. of Mot. Summ. J. 22 [hereinafter Def.'s Br.].[5] ICP has responded and ICP has replied. Doc. 47, Pl.'s Resp.; Doc. 52, Def.'s Reply. Thus, HUD's Motion is ready for review.

---

[5] Defendant's Response Brief and Defendant's Brief are the same. *Compare* Doc. 39, Def.'s Resp. Br., *with* Doc. 42, Def.'s Br. For clarity, the Court will refer solely to the arguments made in Defendant's Brief.

## II.

## LEGAL STANDARD

Generally, summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Batton v. Evers*, 598 F.3d 169, 175 (5th Cir. 2010). "In the FOIA context, however, the traditional standard is modified because 'the threshold question in any FOIA suit is whether the requester can even see the documents the character of which determines whether they can be released.'" *Batton*, 598 F.3d at 175 (quoting *Cooper Cameron Corp. v. U.S. Dep't of Labor, OSHA*, 280 F.3d 539, 543 (5th Cir. 2002)). Under FOIA, an agency that withholds information bears the burden of proving that the information is exempt from disclosure. 5 U.S.C. § 552(a)(4)(B) (stating that "the burden is on the agency to sustain its action"). Courts review the agency's action de novo. *Avondale Indus., Inc. v. N.L.R.B.*, 90 F.3d 955, 958 (5th Cir. 1996).

To survive summary judgment in favor of the plaintiff or to prevail on its own summary judgment, the agency must: (1) identify the documents at issue; and (2) explain why they fall under any statutory exemptions to production. *Cooper Cameron Corp.*, 280 F.3d at 543. An agency may do this through affidavits, declarations,[6] a *Vaughn* index,[7] or some combination of the three. *See Batton*, 598 F.3d at 175. But "[a]n agency may sustain its burden by means of affidavits . . . only 'if they contain reasonable specificity of detail rather than merely conclusory statements.'" *Multi Ag Media*

---

[6] Affidavits and declarations submitted by the government are entitled to a presumption of legitimacy. *Batton*, 598 F.3d at 176. Yet this presumption "does not relieve the withholding agency of its burden of proving that the factual information sought falls within the statutory exemption asserted." *Id.*

[7] "A *Vaughn* index is a common FOIA procedural device that lists the documents responsive to the request and explains why portions have been withheld." *Cooper Cameron Corp.*, 280 F.3d at 544 n.12 (citing *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)).

*LLC*, 515 F.3d at 1227 (quoting *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)). An affidavit is insufficient "if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Cooper Cameron Corp.*, 280 F.3d at 543 (quoting *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)). Remembering the agency's burden, courts should not grant summary judgment based on conclusory or generalized assertions, even if the FOIA requester has not controverted that assertion. *See id.* (citing *Niagara Mohawk Power Corp. v. United States Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999)).

In applying these standards, courts should be mindful that FOIA was enacted "to facilitate public access to Government documents," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), and designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal quotation marks and citations omitted). Accordingly, there is a "strong presumption in favor of disclosure," *Ray*, 502 U.S. at 173, which prompts courts to construe FOIA exemptions narrowly. *See Rose*, 425 U.S. at 361, 366 (FOIA's "exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act").

## III.

## ANALYSIS

FOIA Exemption 6 allows agencies to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). To decide whether Exemption 6 applies, courts engage in a two-part analysis in which they determine: (1) "whether the information requested includes 'files' within the meaning of section 552(b)(6)," *Sherman v. U.S. Dep't of Army*, 244 F.3d 357, 361 (5th Cir. 2001); and (2)

"whether disclosure of such files would constitute a clearly unwarranted invasion of personal privacy." *Avondale Indus., Inc.*, 90 F.3d at 960.

At issue is whether Exemption 6 applies to Part I and Part II of the information that ICP requested from HUD that HUD withheld, specifically: (1) the variables that were rounded or characterized in HUD's response to Part I;[8] (2) HUD's reduction of geographic detail based on the Geographic Unit Rule of 11 in its response to Part I; and (3) HUD's zeroing out of all count and percentage variables based on the Geographic Unit Rule of 11 in its response to Part II.

Without conducting a lengthy analysis, the Court can conclude that Exemption 6 does not apply to the variables that HUD modified. Outside of the general statement that "[t]he number of record entries or data fields requested has a direct impact on the occurrence of unique identifiers in the data," Doc. 39, Def.'s Resp. 10, HUD provides no explanation of why it modified this information. Thus, it has not met its burden of proving that Exemption 6 applies to these modifications.

Additionally, the Court can resolve any issue with HUD's redaction of Part II information. In its Motion for Summary Judgment, ICP clearly takes the position that HUD had not satisfied Part II of its FOIA request. Doc. 34, Pl.'s Br. 16. And in its Reply, ICP argues that HUD has not met its burden of proof because HUD's briefing and *Vaughn* index do not "mention [its] refusal to provide the census tract based records sought in Part 2." Doc. 45, Pl.'s Reply 1. But HUD, in its Reply, states that "[b]efore receiving ICP's response to HUD's summary judgment motion, [it] believed there was no dispute as to whether HUD satisfied Part 2 of ICP's request." Doc. 52, Def.'s Reply 10. Rather,

---

[8] Income, TTP, gross rent, HAP, structure type, race, ethnicity, and family type. Doc. 25, Pl.'s App 9–10, HUD's FOIA Resp.

it "understood that Part 2 of the request would be satisfied if HUD provided ICP the same information as the agency provided in 2012 but with 2013 data," which it claims it did. *Id.* Also, HUD states that it "has no issue with providing the additional public housing authority data field, and HUD sent that data to ICP on November 13, 2015." *Id.* at 10–11. So HUD failed to address ICP's concerns as to Part II, or has already released the requested information. Either way, this issue is resolved: HUD failed to sustain its burden of proof, or satisfied ICP's request, mooting its claim.

This leaves only the issue of HUD's reduction of geographic detail based on the Geographic Unit Rule of 11 in its response to Part I of ICP's request.[9] As the parties have fully briefed this issue, the Court cannot resolve it summarily as it did with the other two issues. The Court will refer to this information that HUD suppressed, redacted, or withheld as the Withheld Information. The Court now determines whether Exemption 6 applies to the Withheld Information.

A.      *Whether the Withheld Information Includes "Similar Files"*

The Withheld Information clearly does not include personnel or medical files. Therefore, to fall under Exemption 6, it must include "similar files." 5 U.S.C. § 552(b)(6). In *United States Department of State v. Washington Post Co.*, the Supreme Court held that Exemption 6 was not limited to "a narrow class of files containing only a discrete kind of personal information," but that the phrase "similar files" was "intended to cover detailed Government records on an individual which can be identified as applying to that individual." 456 U.S. 595, 602 (1982). Because information need only apply to an individual, virtually all data that relates to an individual qualifies as a similar file under Exemption 6. *See Pierce v. Dep't of U.S. Air Force*, 512 F.3d 184, 191 (5th Cir. 2007).

---

[9] This includes its three round elimination of variables and its redaction of owner name.

Here, all of the Withheld Information relates to individuals and, as HUD explains in its *Vaughn* index, its release could "lead to identification of those households receiving housing assistance," which is sufficient to bring it under Exemption 6. *See* Doc. 43, Def.'s App. 68, Vaughn Index; *Multi Ag Media LLC*, 515 F.3d at 1229 (holding that Exemption 6 covered information "easily traceable to individuals"). Thus, the Court finds that Exemption 6 applies to the information HUD suppressed. On that basis, the Court now considers whether HUD's disclosure of the Withheld Information would constitute a clearly unwarranted invasion of personal privacy. *See Avondale Indus., Inc.*, 90 F.3d at 960.

B.      *Whether Disclosure would Constitute a Clearly Unwarranted Invasion of Personal Privacy*

To justify applying Exemption 6 to the Withheld Information, HUD must demonstrate that release of this information would constitute a clearly unwarranted invasion of the privacy interests of the HCV holders—the individuals to whom the Withheld Information relates. *See Sherman*, 244 F.3d at 362. "To determine whether disclosure of such files would constitute a clearly unwarranted invasion of personal privacy, Exemption 6 cases require a balancing of the individual's right of privacy against the preservation of the basic purpose of FOIA, which is to open agency action to the light of public scrutiny." *Avondale Indus., Inc.*, 90 F.3d at 960. Courts must: (1) determine whether there is a substantial[10] privacy interest served by withholding the requested information; (2) determine whether there is a public interest served by it disclosure; and (3) weigh the interests for and against disclosure. *See id.*; *Halloran v. Veterans Admin.*, 874 F.2d 315, 319 (5th Cir. 1989).

---

[10] "[U]se of the word substantial in this context means less than it might seem. A substantial privacy interest is anything greater than a *de minimis* privacy interest." *Multi Ag Media LLC*, 515 F.3d at 1229–30.

1.      Substantial Privacy Interest

Courts have found a substantial privacy interest served by withholding information when the information's disclosure would immediately invade an individual's privacy, or when "there is a substantial probability that [its] disclosure w[ould] cause an interference with personal privacy." *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 875–78 (D.C. Cir. 1989). The former relates to disclosure of categorically personal information such as names, addresses, telephone numbers, birth dates, and social security numbers. *See, e.g., id.* at 875 (collecting cases). The latter relates to what is known as derivative privacy invasion or "derivative-use theory," under which "a court could consider whether information, which standing alone is not private, might nevertheless be used to uncover information that is private." *Sherman*, 244 F.3d 366 n.14 (citing *Ray*, 502 U.S. 177–79).

i.      *The parties' arguments*

HUD relies solely upon a derivative-use theory. Doc. 19, Def.'s Answer to Pl.'s First Am. Compl. ¶¶ 33–34 ("[T]he suppressed data does not result in the same immediate violation of personal privacy that occurs from the release of data such as names, addresses, home telephone numbers, and social security numbers, . . . [but] would result in a derivative invasion of personal privacy."). First, HUD asserts that "[w]here there is a substantial probability that disclosure will cause an interference with personal privacy, it matters not that there may be two or three links in the causal chain." Doc. 42, Def.'s Br. 7 (quoting *Horner*, 879 F.2d at 878). It then suggests a causal chain based on the presumption that "disclosure of housing voucher recipients' identities and income would comprise more than a *de minimis* privacy interest." *Id.* HUD argues that if (1) it provided "[v]oucher landlords, local police, and other members of the communities where housing voucher holders reside"; (2) with voucher holders' household-level information; (3) for "area[s] where the

population of voucher holders is ten or fewer"; then such voucher landlords, local police, and community members could (4) couple that information with their existing knowledge of the residents in that community; and (5) identify housing voucher recipients, interfering with their privacy interest. *Id.* at 7–8 ("Once identified, housing voucher recipients may be vulnerable to harassment, targeting, hatred, marketing, and scamming.").[11]

By contrast, ICP denies the existence of any "case determining that there is a specific 'derivative violation of Exemption 6' defense." Doc. 34, Pl.'s Br. 18. Still, assuming there can be derivative invasions of privacy, ICP proposes that such a violation occurs only when information can be manipulated or linked to other information to lead to the identification of an individual. *See id.* (citing *Forest Guardians v. U.S. Fed. Emergency Mgmt. Agency*, 410 F.3d 1214, 1220 (10th Cir. 2005)). ICP essentially proposes that the derivative-use theory should apply only to certain types of PII: "information which can be used to distinguish or trace an individual's identify . . . when combined with other personal or identifying information which is linked or linkable to a specific individual." Doc. 35, Pl.'s App. 15, Notice PIH-2015-06. ICP contends that, other than one exception, the records it requested are not and cannot lead to discovery of PII. Doc. 34, Pl.'s Br. 18–19. Also, for that one exception—the "possible use of the owner name to produce personally identifiable information"—"HUD has not identified any likelihood that" this will occur. *Id.* at 19. Thus, according to ICP, HUD cannot meet its burden of proving that withholding the requested

---

[11] HUD also argues that ICP's agreement to HUD's use of the Rule of 11 redaction scheme that the parties had used in a previous case "acknowledges the substantial likelihood of a privacy breach when the population of public housing voucher recipients in a census tract is ten or fewer." Doc. 52, Def.'s Reply 2. This, however, is not clear from the record, and it is just as likely the ICP agreed to this because it hoped to expedite its FOIA request. Because HUD bears the burden of proof, and has not shown any support for this argument, the Court rejects it.

information serves a substantial private interest.

        ii.       *The derivative-use theory of privacy invasion*

        a.       Whether case law exists supporting the derivative-use theory

To begin, the Court addresses ICP's argument that there is no case law supporting a derivative violation of Exemption 6. A general search reveals otherwise.

The Supreme Court in *Ray* considered the derivative invasion of privacy that resulted from the release of non-private information, 502 U.S. at 175–77, though it did not expressly acknowledge that this is what it had done. *See id.* at 182 (Scalia, J. concurring) ("I choose to believe the Court's explicit assertion that it is not deciding the derivative-use point, despite what seem to me contrary dicta elsewhere in the opinion."). And though the Fifth Circuit has not decided whether derivative use may provide a basis for withholding information under Exemption 6, *see Cooper Cameron Corp.*, 280 F.3d at 554 n.68 (citing *Ray*, 502 U.S. at 179 (Scalia, J. concurring); *Sherman*, 244 F.3d at 366 n.14), other circuit courts have found a substantial privacy interest served by non-disclosure under the derivative-use theory. *See, e.g., Multi Ag Media LLC*, 515 F.3d at 1230; *Forest Guardians*, 410 F.3d at 1220–21. Accordingly, the Court will consider the derivative-use theory. Because the Fifth Circuit has not directly addressed derivative privacy invasions, the Court will look to other courts for guidance, including the D.C. Circuit, which the Fifth Circuit has recognized as the "federal appellate court with the most experience in this field." *Cooper Cameron Corp.*, 280 F.3d at 543.

        b.       Whether derivative-use supports non-disclosure under Exemption 6

Under the derivative-use theory, an invasion of privacy occurs upon the release of non-private information that might nevertheless be used to uncover private information. *See Sherman*, 244 F.3d 366 n.14 (citing *Ray*, 502 U.S. 177–79). HUD argues that release of the Withheld

Information could lead to discovery of the names and addresses of HCV holders. For this to constitute an invasion of privacy: (1) the HCV holders must have a privacy interest in controlling the discovery of their names and addresses; and (2) a causal relationship must exist between the release of the Withheld Information and the discovery. *See id.*; *Horner*, 879 F.2d at 878. The Court addresses each in turn.

First, the Court considers what privacy interest voucher recipients have in their names and addresses. The privacy interest protected by Exemption 6 broadly encompasses an individual's control of information concerning his person, including control over the dissemination of information concerning his name and home address. *See U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 500 (1994); *Sherman*, 244 F.3d at 361; *Horner*, 879 F.2d at 875 ("In our society, individuals generally have a large measure of control over the disclosure of their own identities and whereabouts."). This is especially true when names and addresses can be combined with other information such as birth dates or financial information. *See True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 736 (S.D. Miss. 2014) ("With both a name and birth date, one can obtain information about an individual's criminal record, . . . social security number, . . . and, quite possibly, information concerning an individual's complete medical and military histories." (quoting *Scottsdale Unified Sch. Dist. No. 48 v. KPNX Broad. Co.*, 955 P.2d 534, 539 (Ariz. 1998) (en banc))); *Horner*, 879 F.2d at 876 (holding privacy interest more significant when names and addresses are combined with financial information). Assuming that releasing the information ICP requests would lead to the discovery of housing voucher recipients' names and addresses, the release would constitute a "disclosure of [individuals'] own identities and whereabouts." *See Horner*, 879 F.2d at 875. Combined with the fact that ICP requests birth dates and financial information, Doc. 35, Pl.'s App. 4, FOIA

Request (requesting "Date of birth" and "Total annual income"),[12] it is clear that the voucher recipients have a substantial privacy interest in controlling both the release of the information ICP requests and the resulting discovery of their names and addresses.[13]

Second, the Court determines whether a causal relationship exists between the release of the Withheld Information and the discovery of voucher recipients' names and addresses. An agency cannot withhold information simply because it is possible that a threat to a privacy interest exists. *See Rose*, 425 U.S. at 381 n.19. "For the Exemption 6 balance to be implicated, there must . . . be a causal relationship between the disclosure and the threatened invasion of privacy." *Horner*, 879 F.2d at 878. The D.C. Circuit has held that this "causal relationship," in the context of derivative use, requires a "*substantial probability* that disclosure will cause an interference with personal privacy, it matters not that there may be two or three links in the causal chain." *Id.* at 878 (emphasis added). Importantly, "[t]he concern . . . is not . . . with the number of steps that must be taken to get to the threatened effect; rather, [it is with] the likelihood that the effect will ever come to pass." *Id.*

The Fourth and Tenth Circuits have both relied upon this rule. *See Havemann v. Colvin*, 537 Fed. App'x 142, 147 (4th Cir. 2013); *Forest Guardians*, 410 F.3d at 1220. The Fourth Circuit held that an agency can "withhold data if it demonstrates a *likelihood* that releasing the information would connect private records to specific individuals." *Havemann*, 537 Fed. App'x at 147 (emphasis added). In that case, the court found that the Social Security Administration had "thoroughly analyzed and

---

[12] ICP states that it has "dropped its request for any birth date information." Doc. 34, Pl.'s Br. 9. This, however, does not change the Court's calculus as ICP still requests financial information.

[13] "[T]he privacy concerns raised by the release of the addresses alone are substantially identical to those raised by the release of both the names and addresses." *Horner*, 879 F.2d at 878.

demonstrated the methods through which the withheld data could lead to the identification of specific individuals." Similarly, the Tenth Circuit found a substantial privacy interest was served by non-disclosure where "[d]isclosure of the specific location of NFIP insured structures could *easily lead* to the discovery of an individual's name and home address." *Forest Guardians*, 410 F.3d at 1220 (emphasis added). There, disclosure would easily lead to discovery because the requester had conceded that the information it sought could be manipulated to derive individual addresses. *See id.*

Here, HUD has outlined the causal chain of events that would have to occur for releasing the Withheld Information to lead to discovery of voucher recipients' names and addresses. First, the information released would have to include household-level data for households in a geographic area with ten or fewer voucher recipients. Second, it would have to be released to requesters who possessed existing knowledge of residents in that particular geographic area. Third, the requesters would have to combine the released information with their existing knowledge to identify voucher recipients. But it has not addressed whether there is a likelihood or substantial probability of this chain of events's occurrence. *See Horner*, 879 F.2d at 878. Said differently, HUD has *explained* how disclosure could lead to discovery of individual names and addresses, but it has not *demonstrated* that it would. *See Havemann*, 537 Fed. App'x at 147. Also, ICP does not admit that any of the requested information aside from "Owner name" may be manipulated to derive names and addresses. *See* Doc. 35, Pl.'s App. 4, FOIA Request; Doc. 34, Pl.'s Br. 18–19; *Forest Guardians*, 410 F.3d at 1220.

HUD supports its position with the Declaration of Deena S. Jih, an Attorney Advisor in the Office of General Counsel, Administrative Law Division of HUD, and with a *Vaughn* index. Doc. 43, Def.'s App. 3, Jih Decl. ¶ 1, 68, Vaughn Index. But in both, HUD offers little more than the conclusory statement that "[r]elease would result in providing household level data for a geographic

area populated with 10 or less households receiving housing assistance, and therefore, lead to identification of those households . . . and violate their personal privacy." *Id.* at 68, Vaughn Index. This generalized assertion assumes that providing "household level data for a geographic area populated with 10 or less households receiving housing assistance" will certainly lead to these households' identification. Whether this is true, or even likely, is the very issue before the Court. The Court cannot grant summary judgment based on such conclusory or generalized assertions. *See Cooper Cameron Corp.*, 280 F.3d at 543 (citing *Niagara Mohawk Power Corp.*, 169 F.3d at 18).[14]

Also to support its position, HUD references the severe negative results associated with discovery of voucher recipients' names and addresses, emphasizing the substantiality of individuals' privacy interest in this information. HUD argues that voucher recipients can become the target of bullying, harassment, hatred, marketing, and scamming. *See* Doc. 42, Def.'s Br. 11. It bases this assertion on three articles that point out egregious treatment of voucher recipients: Brentin Mock, *How Los Angeles County Furthered Racist 'Fair-Housing' Practices*, CityLab from The Atlantic (Jul 28, 2015); Loretta Waldman, *Bristol Woman's Story of Harassment*, Hartford Courant (November 18, 2002); and Jill Maxwell, *Sexual Harassment at Home: Altering the Terms, Conditions, and Privileges of Rental Housing for Section 8 Recipients*, 21 Wis. Women's L. J. 223 (2006). Doc. 42, Def.'s Br. 11–12 (citing Doc. 43, Def.'s App. 648–98). These articles, however, do nothing more than show the potential results from discovery of voucher recipients names and addresses. They do not address

---

[14] HUD also argues that "[t]he likelihood that a link would occur between the requested data and existing community knowledge is supported by the generally accepted methodologies adopted by other federal agencies for protecting privacy in large data sets when the population of cases is below a certain defined threshold." Doc. 52, Def.'s Reply 5. For support, it generally references a Statistical Policy Working Paper for other federal agencies. Doc. 43, Def.'s App. 511. But It does not specifically explain or demonstrate how the data sets in this case will likely lead to identification of individuals. HUD's general comparison of its data privacy practices to those of other federal agencies does not satisfy its burden of proof.

information releases under FOIA or the likelihood that individuals' names and addresses would be discovered in this case. Simply put: they do not speak to causality, which is essential.

For these reasons, the Court concludes that HUD has not shown the necessary causal connection for Exemption 6 to govern this case. "The legislative history is clear that Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities." *Rose*, 425 U.S. at 381 n.19. HUD has demonstrated that a substantial privacy interest would be served by withholding non-private information that could lead to the discovery of HCV holders' names and addresses, but it has not demonstrated a substantial probability that such a discovery would happen. Thus, it cannot sustain its burden of proving that the information is exempt from disclosure. *See* 5 U.S.C. § 552(a)(4)(B); *see Horner*, 879 F.2d at 878 ("[T]here must . . . be a causal relationship between the disclosure and the threatened invasion of privacy.").

The Court, however, will not end its analysis here. Given that the "standard at this stage is not very demanding," the Court is "willing to engage in the balancing inquiry" by assuming *arguendo* that HUD has shown how disclosure of the Withheld Information would lead to discovery of individual names and addresses. *Multi Ag Media LLC*, 515 F.3d at 1230. Operating under this assumption, the Court concludes that a minimal—if only slightly greater than *de minimis*—privacy interest exists in non-disclosure of the Withheld Information. *Supra* note 7; *see also Multi Ag Media LLC*, 515 F.3d at 1230 ("Because USDA has not made a showing of how often this may be the case, we are not persuaded that the privacy interest that may exist is particularly strong."). And because "[e]ven a 'minimal' privacy interest in . . . an [individual]'s name and home address outweighs a nonexistent public interest," *Fed. Labor Relations Auth. v. U.S. Dep't of Def., Army & Air Force Exch. Serv., Dallas, Tex.*, 984 F.2d 370, 375 (10th Cir. 1993), the Court now turns to whether disclosure

of the Withheld Information serves a public interest. *See Halloran*, 874 F.2d at 319.

2.     Public Interest

"The Supreme Court has narrowly defined the 'public interest' relevant to [E]xemption 6 balancing as 'the extent to which disclosure would serve the core purpose of . . . FOIA, which is contribut[ing] significantly to the public understanding of the operations or activities of the government.'" *Sherman*, 244 F.3d at 361 (quoting *U.S. Dep't of Def.*, 510 U.S. at 495). Information that informs the public about "an agency's performance of its statutory duties falls squarely within [FOIA's] purpose. That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." *U.S. Dep't of Def.*, 510 U.S. at 495–96 (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989)). The requester's stated intentions or purposes are irrelevant; rather, "courts must consider only whether the requested information sheds light on agency action," *Sherman*, 244 F.3d at 362, or whether the "addition of the redacted identifying information would . . . shed any *additional* light on the Government's conduct of its obligation." *Ray*, 502 U.S. at 178 (emphasis added).

i.     *The parties' arguments*

ICP argues that "[t]here is a substantial public interest in HUD's administration of the voucher program," including HUD's compliance with its statutory duties under:

- 42 U.S.C. § 3608(e) ("The Secretary of Housing and Urban Development shall . . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter.");

- 42 U.S.C. § 1437f(a) (stating "purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed

housing");

- 42 U.S.C. § 1437f(o) ("Voucher program");

- 24 C.F.R. § 982 (regulations implementing 42 U.S.C. § 1437f(o)); and

- 76 Fed. Reg. 22122 ("Demonstration Project of Small Area Fair Market Rents in Certain Metropolitan Areas").

*See* Doc. 34, Pl.'s Br. 8–10, 12; Doc. 45, Pl.'s Reply 19–20. ICP also argues that "HUD'[s] own journal of policy development and research has directly stated that the 50058 data on individual voucher holders is the basis for important research and analysis of the administration of the voucher program." Doc. 34, Pl.'s Br. 20. Specifically:

> Public housing authorities (PHAs) capture and store a wealth of data about client demographics and spatial location. In most cases, these data are collected in administrative databases designed to support program operations and that comply with various HUD reporting requirements. One such data source, Form HUD-50058, provides comprehensive secondary, household-level, program participant data. The 50058 data include household-level information for all participants in the public housing program, HCVP, and Section 8 Moderate Rehabilitation program. In exhibit 1, we summarize the information available from the 50058 data.
>
> This article outlines a process to transform the 50058 data into a spatially located, person-period data set using off-the-shelf software and free tools. The resulting data set enables researchers to conduct a variety of longitudinal, microscale spatial analyses that they can *use to explore administration-and policy-relevant questions about how the HCVP functions* across space and time.

*Id.* at 20 (emphasis added) (quoting Doc. 35, Pl.'s App. 48–50, Eric Schultheis, Gregory Russ & Carolina Lucey, *Using Administrative Data for Spatial and Longitudinal Analysis of the Housing Choice Voucher Program*, 4 Cityscape 195, 196–97 (2012) [hereinafter Schultheis]).

HUD responds that "Form HUD-50058 data does not directly relate to HUD's statutory duties," and that HUD's "role is limited in interpreting the statute, implementing regulations, and enforcing the statute and regulations." Doc. 42, Def.'s Br. 11. Further, it contends that PHAs

administer the program, and that it has no control. *Id.* at 12. Because of this, HUD argues that release of the Withheld Information would reveal nothing about its character and bears only an attenuated relationship to its conduct. *Id.* (quoting *Hopkins v. HUD*, 929 F.2d 81, 88 (2d Cir. 1991)). It also argues that release of the Withheld Information has very little incremental value. *Id.* (quoting *Schrecker v. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003)).[15] The Court addresses each argument in turn.

     *ii.*     *HUD's Statutory Duties*

HUD's contention that Form HUD-50058 does not directly relate to its statutory duties is incorrect.[16] First, HUD has a statutory duty to administer the HCV program (HCVP). *See* 42 U.S.C. § 1437f(o); 24 C.F.R. § 982.3. Though PHAs are given broad discretion to implement the program, they must comply with the low-income housing assistance statute, HUD-issued regulations, and HUD oversight. 24 C.F.R. § 982.52; *see also, e.g., Johnson v. Hous. Auth. Of Jefferson Par.*, 442 F.3d 356, 357 (5th Cir. 2006). HUD-issued regulations detail the "the program requirements for the tenant-based housing assistance program." 24 C.F.R. § 982.2. And HUD oversight includes instituting programs such as the Small Area Fair Market Rent Program (SAFMR), which it has implemented in Dallas. *See* Section 8 Housing Choice Voucher Program—Demonstration Project

---

[15] HUD makes a third argument addressing ICP's stated intention to use the requested information. *See* Doc. 42, Def.'s Br. 11 ("Allegations of Wrongdoing Do Not Constitute a Public Interest."). Because the requester's stated intentions or purpose are irrelevant for considering the public interest in disclosure of information, the Court will not address this argument. *See Sherman*, 244 F.3d at 362. ICP's stated purpose does not affect the Court's decision as to whether a public interest exists.

[16] In making this argument, HUD relies on *Hopkins v. HUD* for support. 929 F.2d 81. It is distinguishable. In *Hopkins,* the requested information could not be used to directly monitor HUD's performance. *See id.* at 88. First, the information had to be used to contact individual employees who could then confirm or deny that HUD had violated prevailing wage laws. *See id.* Here, the requested information can be used to directly gauge HUD's administration of the HCV program.

of Small Area Fair Market Rents in Certain Metropolitan Areas, Discussion of Comments, and Request for Participation, 76 F.R. 22122-01. Additionally, HUD has the authority to "enforce the annual contribution contracts between PHA's and HUD, to conduct audits and to cut off funds. HUD undoubtedly has considerable authority to oversee the operation of the PHA's." *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 424 (1987) (internal citations omitted).

Second, HUD has admitted that the HUD-50058 data ICP seeks can be "use[d] to explore administration-and policy-relevant questions about how the HCVP functions." Doc. 34, Pl.'s Br. 20 (quoting Doc. 35, Pl.'s App. 48–50, Schultheis 196–97). That is, HUD-50058 contains information that directly relates to questions about HUD's administration of the HCVP. Therefore, the Court concludes that release of this information, including the Withheld Information, would shed light on HUD's performance of its statutory duties. *See HUD*, 929 F.2d at 88.

In consequence, the Court finds that ICP has shown that a public interest exists in monitoring HUD's performance of its statutory duty to administer the HCVP, which encompasses its implementation of oversight measures such as the SAFMR in Dallas. Additionally, the Court finds that ICP has shown that this public interest is served by disclosure of the Withheld Information.

iii.    *Incremental Value of Disclosing the Withheld Information*

The Court rejects HUD's contention that disclosing the Withheld Information has very little incremental value. HUD correctly states that the Court "should focus not on the general public interest in the subject matter of the FOIA request, but rather on the incremental value of the specific [Withheld Information]." Doc. 42, Def.'s Br. 12 (quoting *Schrecker*, 349 F.3d at 661).[17] But HUD

---

[17] ICP argues that HUD's reliance on *Schrecker* is misplaced because it is an Exemption 7 case. Doc. 45, Pl.'s Reply 20. However, the rule from *Schrecker* is derived from *Ray*, which is binding on this Court.

incorrectly takes the position that "[w]ith the current data that HUD has released, ICP can conduct the same calculations that ICP provides in its brief using the data from HUD's previous releases [the Calculations]." *Id.* It also incorrectly asserts that ICP could perform the Calculations using tract-level data HUD already released, and that the results of the Calculations using tract-level data, suppressed data, and unsuppressed data are essentially equivalent. *Id.* at 14–16.

First, ICP cannot perform the Calculations using tract-level data. Though HUD maintains that ICP could perform the Calculations using already-released-tract-level data, it admits that: "ICP's calculation uses zip code poverty rates rather than census tract poverty rates." Doc. 42, Def.'s Br. 13. ICP does this because the SAFMR is implemented using zip codes, not census tracts. Doc. 34, Pl.'s Br. 13. Thus, as ICP argues, it cannot effectively use the records HUD released because HUD deleted zip code information, and analyzing the SAFMR using census tract information would yield inaccurate results. *Id.*; *see also* Doc. 35-1, Pl.'s App. 205–06, ICP Comment.

Second, performing the Calculations using tract-level data, suppressed data, and unsuppressed data does not yield essentially equivalent results. Though HUD asserts that the results of Calculations using tract-level data, suppressed data, and unsuppressed data are essentially equivalent, it provides a chart that shows that they are sometimes materially different. *See id.* at 15–16 (showing disparity of several percent between calculations using different base information).

So release of the Withheld Information would theoretically provide more accurate results. Accordingly, the Court concludes that release of the Withheld Information would "shed . . . additional light on the government's conduct of its obligation." *Ray*, 502 U.S. at 178.

---

502 U.S. at 178 ("The addition of the redacted identifying information would not shed any additional light on the Government's conduct of its obligation.") Accordingly, the Court will apply this rule.

3.      Balancing the Interests

Having assumed a substantial privacy interest served by withholding the Withheld Information, and having found a public interest served by its disclosure, the Court now balances "the interests for and against disclosure." *Halloran*, 874 F.2d at 319. In doing so, the Court remains mindful of FOIA's "strong presumption in favor of disclosure." *Ray*, 502 U.S. at 173. "'[U]nless the invasion of privacy is "clearly unwarranted," the public interest in disclosure must prevail,' and the agency may not withhold the files under Exemption 6." *Multi Ag Media LLC*, 515 F.3d at 1232 (quoting *Ray*, 502 U.S. at 177)).

                    i.      *The parties' arguments*

ICP argues that "[t]he public has a particular and significant interest in the information [it] seeks. There is a special need for public scrutiny of programs distributing extensive amounts of public funds in the form of subsidies and other financial benefits." Doc. 34, Pl.'s Br. 20 (citing *Brock v. Pierce County*, 476 U.S. 253, 2623 (1986)). It also makes several arguments the Court has already addressed: "HUD's own journal . . . has directly stated that the 50058 data . . . is the basis for . . . analysis of the administration of the voucher program," *id.* at 20; "[t]here is no showing of the likelihood of harassment . . . from the disclosure." *Id.* at 23.

HUD argues that multiple alternative or less intrusive means of obtaining the Withheld Information existed. Specifically, "HUD offered to conduct any desired analysis for ICP using the unsuppressed household-level data," and it "offered and highly encouraged ICP to submit to HUD an application for a Data License Agreement that would allow the confidential release of all data." Doc. 42, Def.'s Br. 17; *see also* Doc. 43, Def.'s App. 54–58, Negot. Emails. ICP refused both offers.

These arguments, along with arguments made throughout the parties' briefing, identify the

relevant factors that affect the Court's balancing analysis in this case: (1) the risk that disclosure will lead to mistreatment, *see id.* at 176–77; (2) whether the public interest has been adequately served by release of redacted records, *see id.* at 178; (3) the availability of alternative sources or means of obtaining the information, *see U.S. Dep't of Def. Dep't of Military Affairs v. Fed. Labor Relations Auth.*, 964 F.2d 26, 28 (D.C. Cir. 1992) [hereinafter *DOD*]; and (4) the extent to which the agency is distributing, spending, or managing public funds. *Multi Ag Media LLC*, 515 F.3d at 1232 (collecting cases). The Court considers each in turn.

ii.      *Factor analysis*

First, the Court considers the risk that disclosure of the Withheld Information will lead to mistreatment of HCV holders. *See Ray*, 502 U.S. at 176–77. HUD states that disclosure could lead to discovery of their names and addresses, exposing them to possible "harassment, targeting, hatred, marketing, and scamming." Doc. 42, Def.'s Br. 7–8. But ICP counters that HUD has not shown any likelihood of this happening. Doc. 34, Pl.'s Br. 23. For the reasons stated above, ICP is correct. Still, the Court recognizes that a "danger of mistreatment," even an unlikely danger, increases the weight of a privacy interest served by withholding the Withheld Information. *See Ray*, 502 U.S. at 176–77. Thus, this factor weighs slightly in favor of non-disclosure.

Second, the Court considers whether the public interest has been adequately served by release of the redacted records. *See id.* at 178. FOIA clearly authorizes "[r]edaction as a means of protecting a private individual's interests . . . , so long as it is utilized only to the extent necessary to prevent a clearly unwarranted invasion of personal privacy." *Avondale Indus., Inc.*, 90 F.3d at 959. Here, ICP stipulated to redaction under the Census Tract Rule of 11, but HUD redacted information in accordance with the Geographic Unit Rule of 11. Instead of redacting information based only on

census tracts or aggregated sets of census tracts, HUD did so based on census tract/zip code/PHA combinations. Importantly, the redacted records HUD released did not include information that ICP needs to analyze the SAFMR's efficacy in Dallas. Thus, the public interest here has not been *fully* served by the redacted records' release. Whether their release has *adequately* served the public interest, however, is unclear. HUD has attempted to show that ICP could adequately perform the Calculations using the redacted records, but HUD's attempt is "not supported by any evidence in the summary judgment record . . . . Not even the Jih declaration."[18] Doc. 45, Pl.'s Reply 20. Accordingly, the Court concludes that this factor is neutral.

Third, the Court considers the availability of alternative sources or means of obtaining the Withheld Information. *See DOD*, 964 F.2d at 28. The two relevant alternatives here are HUD's offer to conduct any desired analysis for ICP using the unsuppressed household-level data and HUD's offer to consider ICP for a Data License Agreement. HUD argues the availability of these alternatives weighs heavily in favor of non-disclosure. The Court addresses each in turn.

HUD's offer to conduct analysis for ICP essentially is an offer to provide a redacted summary of the information ICP requested.[19] *See* Doc. 43, Def.'s App. 56–59. "HUD would aggregate the [requested HUD-50058] household-level data," but obscure identifying details as defined by the Geographic Unit Rule of 11. *Id.* ("The agency is prepared to offer population characteristics collected in the 50058 or 50059 for any *geographic unit* in which there are 11 or more households." (emphasis

---

[18] This rehashes the incremental-value argument addressed in Part III.B.2.iii; therefore, HUD's attempt also fails for the reasons stated there.

[19] ICP disagrees that HUD offered to conduct analysis on its behalf. Doc. 48, Pl.'s Resp. Br. 14 ("The record shows no offer by HUD to conduct the analysis for ICP rather than produce the records."). However, the record reflects that HUD did make this offer. Doc. 43, Def.'s App. 58, Negot. Emails (stating that HUD is "willing to provide whatever analysis [ICP is] interested in"). So the Court rejects this argument.

added)). This approach does not adequately serve the public interest. FOIA directs agencies to disclose their records upon request, 5 U.S.C. § 552(a)(3), though an agency may delete identifying details when it discloses copies of records, so long as the details to be deleted are "reasonably segregable." *Id.* §§ 552(a)(2), (b); *see Avondale Indus., Inc.*, 90 F.3d at 959. What HUD proposes would not be a disclosure of records, but an aggregation of the information from the records.[20] Also, any information withheld from HUD's proposed summary would not be reasonably segregable because the analysis, by its nature, is not a segregable record. As a result, the Court concludes that the availability of this alternative does not weigh in favor of non-disclosure.

HUD also offered to consider ICP for a Data License Agreement, which HUD issues to research organizations "for the explicit purpose of conducting innovative research projects that inform HUD's policies and programs." Doc. 42, Def.'s Br. 18. Under the agreement, ICP would have full access to the suppressed information. ICP refused this offer because the Data License Agreement would restrict the use of the information in several ways and give HUD reviewing authority over any article, report, or statistical summary ICP generated. Doc. 46, Pl.'s Reply App. 2–3. HUD states that its "policy . . . is not to withhold approval or release of any report because of its content." Doc. 52, Def.'s Reply 9. But implicit in this statement is recognition that HUD has the authority to do so. *See id.* While ICP could have obtained the Withheld Information through a Data License Agreement, the agreement would heavily restrict the use of the information. FOIA does not. This key difference decreases the effect this available alternative has on the weight of the privacy interest served by non-disclosure. For that reason, the Court concludes that the availability of this alternative weighs in

---

[20] In the past, redacted summaries of information have been allowed, but those summaries were the records themselves. *See, e.g.*, *Ray*, 502 U.S. at 168–69; *Rose*, 425 U.S. at 380.

favor of non-disclosure, but only slightly.

Fourth, the Court considers the extent to which HUD is distributing, spending, or managing public funds. *See Multi Ag Media LLC*, 515 F.3d at 1232 ("[T]here is a special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies."). Here, HUD has the ability to control funding to PHAs and the HCVP. "HUD and the local Dallas area voucher program administrators spend approximately $220,000,000 a year in rent subsidies to landlords and administrative fees to public agencies for the vouchers covered by the records requested." Doc. 34, Pl.'s Br. 10 (citing Doc. 35, Pl.'s App. 61). There is a significant public interest in data such as the Withheld Information that would allow the public to more easily monitor HUD's distribution and management of these funds. Thus, this factor weighs heavily in favor of the public's interest in disclosure.

C.      *Conclusion*

In sum, the Court finds that the relevant factors in this case, weighed together, tip the scales in favor of the public's interest in disclosure. The Court recognizes HUD's serious and legitimate privacy concerns over the release of the Withheld Information that might allow requesters to discover HCV holders' names and addresses; however, HUD has not shown a sufficient causal nexus between such release and discovery. Even if it had, the public's interest in more easily monitoring HUD's administration of the HCVP—especially its distribution and management of more than $200,000,000 in subsidies—along with FOIA's strong presumption in favor of disclosure, lead to the conclusion that the public interest in disclosure outweighs the HCV holders' privacy interest. Accordingly, release of the Withheld Information would not "constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), meaning HUD cannot rely on Exemption 6 to

withhold the requested HUD-50058 information. *See Multi Ag Media LLC*, 515 F.3d at 1232 (quoting *Ray*, 502 U.S. at 177)).

## IV.

## CONCLUSION

For these reasons, ICP's Motion for Summary Judgment (Doc. 33) is **GRANTED in part** and **DENIED in part**, and HUD's Motion for Summary Judgment (Doc. 41) is **DENIED**.

ICP has requested the Court grant the following relief: (1) an order requiring HUD to produce the agency records and enjoining it from withholding them; (2) an order referring the matter to the Merit Systems Protection Board for investigation; (3) an order prohibiting HUD from relying on Exemption 6 to deny future FOIA requests for the same records ordered produced in this case; and (4) attorneys' fees and costs.

The Court, pursuant to 5 U.S.C. § 552(a)(4)(B), **ORDERS** HUD to produce and **ENJOINS** it from withholding the records ICP sought in Part I and Part II of its FOIA request. HUD may redact the information in accordance with the Census Tract Rule of 11, as stipulated to by ICP. If HUD has already satisfied or partially satisfied ICP's request, it need only provide the supplemental information to completely satisfy it.

Further, ICP may submit supplemental briefing on whether the Court should refer this matter to the Merit Systems Protection Board for investigation. Any such submission should occur within thirty (30) days of the date of this order.

The Court **DENIES** ICP's request that the Court issue an order prohibiting HUD from

relying on Exemption 6 to deny future FOIA requests for the same records ordered produced in this case. ICP prevails on its Motion for Summary Judgment because HUD has failed to sustain its burden of proof, not because ICP has convinced the Court that HUD's derivative-use theory lacks merit. The data suppression method HUD applies is "based on a well-established concept practiced by many federal agencies handling large data sets. Due to the fact that is not feasible to analyze and evaluate each piece of data individually, agencies have implemented conceptual rules to avoid an inadvertent disclosure of private information." Doc. 42, Def.'s Br. 4. In the future, HUD may be able to substantiate this practice and show that there is a substantial probability that release of general Form HUD-50058 data would lead to the identification of voucher recipient households, resulting in a clearly unwarranted invasion of privacy. Thus, the Court finds that ruling on this issue at this time would be premature.

ICP may submit an application for attorneys' fees and costs. Any such submission should occur within sixty (60) days of the date of this order.

SO ORDERED.

SIGNED: September 13, 2016.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE